# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1574 | **DATE** | 9/19/2001 |
| **CASE TITLE** | MARK HANSON vs. PRAIRIE MATERIAL SALES, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment is granted.

(11) ☒ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 20 2001 | |
| | Notified counsel by telephone. | | date docketed | 21 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 01 SEP 19 PM 5:30 | date mailed notice | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION.

DOCKETED
SEP 20 2001

| | |
|---|---|
| MARK HANSON, | |
| Plaintiff, | Case No. 00 C 1574 |
| v. | The Honorable John W. Darrah |
| PRAIRIE MATERIAL SALES, INC., | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mark Hanson ("Plaintiff" or "Hanson") filed a Complaint alleging that Defendant Prairie Material Sales ("Defendant" or "Prairie") violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*, by discharging him because of disabilities, hyperactive lung disease and a herniated disk injury, and subjecting him to a hostile work environment during his employment. Defendant has filed a motion for summary judgment on both claims. Plaintiff subsequently withdrew his hostile work environment claim. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12.) For the reasons that follow, Defendant's Motion for Summary Judgment [8] is GRANTED.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a

motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate through specific evidence that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## BACKGROUND

The undisputed facts taken from the parties' Local Rule 56.1(a) & (b) statements of material facts [1] (referred to herein as "Pl.'s 56.1" and "Def.'s 56.1") and exhibits are as follows.

---

[1] Plaintiff has not complied with LR. 56.1(b), which specifies that the party opposing summary judgment will file "a concise response to the movant's statement that shall contain ... a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Plaintiff has provided responses which fail to deny Defendant's statements and instead attempt to supply additional facts. A court may strike 56.1 statements in their entirety when they contain evasive answers and improper argument as such tactics defeat

Defendant Prairie owns and operates approximately ten yards in the Cook County area and twenty-six yards in the Chicagoland area that manufacture and load ready-mix concrete into trucks. (Def's 56.1 ¶ 3.) Prairie has over 280 ready mix trucks ("mixers") and employs 300 ready-mix drivers in its Cook County yards. (Def.'s 56.1 ¶ 3.) Plaintiff Hanson was employed by Prairie from May 27, 1987 until November 4, 1999. (Def.'s 56.1 ¶¶ 6, 48.) During the time of his employment, Hanson enjoyed driving and had no problems at Prairie. (Def.'s 56.1 ¶ 7.) During his employment, Hanson was represented by Teamsters Local 786 ("Union") and covered by a labor agreement between Prairie and the Union. (Def.'s 56.1 ¶ 8.)

Hanson claims that he is disabled because he has hyperactive lung disease and a herniated disk. (Def.'s 56.1 ¶ 49.) Hanson does not claim he suffers from any other disabilities.[2] (Def.'s 56.1

---

the purpose for which Rule 56.1 was implemented. *Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000). It is deemed as admitted all 56.1 responses which fall into this category.

Plaintiff made a general objection to the declaration of Michael Borjas and the affidavit of Anthony Scott, either without any references to the record or with a reference to Borjas' or Scott's entire deposition testimony, arguing the declaration and affidavit conflicted with Borjas' and Scott's deposition testimony. However, Plaintiff has not pointed out any discrepancies between the declarations and the deposition testimony. Plaintiff's objections to the declarations did not reference any evidentiary materials. Therefore, Plaintiff's general objections to Borjas' declaration and Scott's affidavit are improper, and the paragraphs of Defendant's Rule 56.1 Statement so objected to will be deemed admitted.

Plaintiff also referred to the entire deposition transcripts of Michael Borjas and Anthony Scott in an attempt to contradict facts in Defendant's Rule 56.1 Statement. Such references were improper. *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1135 (7th Cir. 1997). The court is "not required to sift through every transcript [Plaintiff has] filed to find testimony to back up his case." *Uhl*, 121 F.3d at 1135. Therefore, paragraphs of Defendant's Rule 56.1 Statement denied in this manner will be deemed admitted.

[2]Hanson has also claimed an alleged "chemical sensitivity". (Pl.'s 56.1 ¶ 49.) In his deposition, Hanson claimed that he was limiting himself to the allegations in the Complaint. (Hanson Dep. 68.) However, Hanson's alleged chemical sensitivity was not raised in his Complaint and therefore is not properly before the Court. Furthermore, this additional fact will be disregarded because it is not contained in a separate statement of facts and thus is improperly

¶ 49.) Hanson claims that Prairie has been aware of his medical conditions since 1989. (Def.'s 56.1 ¶ 93.)

While at Prairie, Hanson had to climb repeatedly up and down a ladder to wash down the truck. (Def.'s 56.1 ¶ 67.) Ready-mix drivers do not have many opportunities to take breaks and stretch. (Def.'s 56.1 ¶ 67.)

Hanson was required to have a medical examination every two years under Department of Transportation regulations. (Def.'s 56.1 ¶ 56.) In 1992, 1994 and 1996, the examining doctor noted that Hanson had no history of head or spinal injuries. (Def.'s 56.1 ¶ 56.) In 1988, the examining doctor noted that Hanson's back had been injured two years ago but was asymptomatic at the time of the examination. (Def.'s 56.1 ¶ 56.)

On July 10, 1990, Hanson had a CT scan at MedFirst Hospital after sustaining a back injury on July 9, 1990, while pulling chutes from the truck. (Def.'s 56.1 ¶ 50.) The CT scan of Hanson's lumbar spine was abnormal. (Def.'s 56.1 ¶ 51.) The examining doctor believed that Hanson may have a herniated disk in his lumbar spine. (Def.'s 56.1 ¶ 51.) The examining doctor asked Hanson to see an orthopedic surgeon, but Hanson did not. (Def.'s 56.1 ¶ 51.)

Hanson also received treatment for his back on February 1, 1999, at Concentra Medical Centers after injuring his back and groin when he slipped on ice while working for Prairie at Midway Airport on January 25, 1999. (Def.'s 56.1 ¶ 52.) An x-ray did not show evidence of spondylolisis or a fracture, but it did reveal mild degeneration at L5-S1 level. (Def.'s 56.1 ¶ 52.) The examining doctor, Romas Kirvaitisat, cleared Hanson to return to work as a driver on February 3, 1999. (Def.'s 56.1 ¶ 53.) Dr. Kirvaitisat imposed temporary restrictions. (Def.'s 56.1 ¶ 53.) Hanson was able to

---

pled under Local Rule 56.1. *Valenti v. Qualex, Inc.*, 970 F.2d 363, 369 (7th Cir.1992).

perform his job functions, including flipping over the chute to his truck. (Def.'s 56.1 ¶ 53.) Hanson did not ask Borjas for any new accommodations regarding his back following this incident. (Def.'s 56.1 ¶ 57.)

Hanson also saw his primary care physician, Dr. Mon, as a follow-up visit after treatment at Concentra and three weeks before his deposition. (Def.'s 56.1 ¶ 54.) Dr. Mon never diagnosed Hanson with a herniated disk. (Def.'s 56.1 ¶ 54.) Hanson has not injured his back since February 1999 and does not recall the last time he threw his back out. (Def.'s 56.1 ¶ 55.) Hanson has never had surgery on his back and has not discussed the prospect of surgery with any doctor since he originally injured his back. (Def.'s 56.1 ¶ 58.) He currently uses a tens unit, which alleviates some of his back pain. (Def.'s 56.1 ¶ 59.) He has never applied for short- or long-term disability benefits for his back. (Def.'s 56.1 ¶ 60.)

Because of his alleged back injury, Hanson must shift in his seat when sitting for long periods of time. (Def.'s 56.1 ¶ 63.) Hanson is also unable to roughhouse with his children or play sports. Hanson does not use a walker or other device, but he walks at a slower pace and cannot walk long distances without experiencing discomfort in his back. (Def.'s 56.1 ¶¶ 63, 64, 65.) Most of the time, Hanson has no trouble going up and down stairs; but he occasionally needs his son's help to guide him up the stairs from behind. (Def.'s 56.1 ¶ 63.)

When Hanson complained that driving a front-wheel-drive truck irritated his back, Prairie accommodated him by assigning him to a Ford model straight truck, which he believed offered a more comfortable ride than the standard mixer or other straight trucks. (Def.'s 56.1 ¶ 90.) Driving a straight truck has helped Hanson's back. (Def.'s 56.1 ¶ 91.)

Hanson claims he developed problems with his lungs when he was exposed to a chemical

spill at Chicago Magnet Wire during a delivery on July 18, 1989. (Def.'s 56.1 ¶ 68.) He was treated at Palos Community Hospital on September 6, 1989. (Def.'s 56.1 ¶ 69.) Treatment included a bronchial provocation study which suggested "hyperactive airways". (Def.'s 56.1 ¶ 69.) Since receiving treatment at Palos Community Hospital in September 1989, Hanson has not sought or received any medical attention regarding his lungs since that time. (Def.'s 56.1 ¶ 70.) Other than some initial prescriptions issued shortly after his initial treatment, he has not been on any medication for his lungs. (Def.'s 56.1 ¶ 71.) He has never received short- or long-term disability benefits for his lungs. (Def.'s 56.1 ¶ 72.) He has never missed work due to his lung condition. (Def.'s 56.1 ¶¶ 74, 78.)

Because of his alleged lung condition, Hanson experiences shortness of breath during stressful situations at home, which require him to sit on the floor and hug his knees. (Def.'s 56.1 ¶ 75.) Between twenty-five to thirty-five percent of the time that he and his wife have sexual relations, he must stop because of his breathing. (Def.'s 56.1 ¶ 77.) He has never experienced shortness of breath while working at Black Horse Trailers. (Def.'s 56.1 ¶ 76.)

Yard 8 is located at 385 East Touhy, Des Plaines, Illinois, approximately one mile from O'Hare airport. (Def.'s 56.1 ¶ 85.) Yard 9 is located at 5300 West Lake Street, Melrose Park, Illinois, approximately ten miles from Yard 8. (Def.'s 56.1 ¶ 85.) Neither Hanson's lungs nor his ability to breathe are affected by going near Yards 8 or 9. (Def.'s 56.1 ¶ 73.) Hanson claimed he would experience problems with his right eye when traveling to Yards 8 and 9 or in the O'Hare Airport area. (Def.'s 56.1 ¶ 84.) Hanson is not claiming his alleged eye problems constitute a disability for purposes of this lawsuit. (Def.'s 56.1 ¶ 89.) Prairie dispatchers made efforts not to send Hanson to Yards 8 or 9 unless it was absolutely necessary. (Def.'s 56.1 ¶ 87.)

He claims he was treated differently than allegedly non-disabled persons because he complained about going to Yards 8 and 9 and had to drive a straight truck due to his back. (Def.'s 56.1 ¶ 81.) These were the only accommodations that Hanson requested regarding his alleged disabilities. (Def.'s 56.1 ¶ 92.)

Hanson has testified he had no reason to believe that Human Resources Director Michael Borjas or Safety Manager Tony Scott are prejudiced against people with disabilities or that Prairie supervisors perceived him as being limited in his ability to perform everyday functions, including his ability to walk and perform manual tasks. (Def.'s 56.1 ¶¶ 80, 82.) At the time of his discharge, Borjas did not perceive Hanson as having a significant back injury or any other type of medical condition. (Def.'s 56.1 ¶ 83.)

Prairie uses three types of mixers: (1) front-wheel-drive trucks, constituting fifteen percent of Prairie's fleet; (2) straight trucks, constituting sixty percent of the fleet; and (3) front discharge trucks, constituting twenty-five percent of the fleet. (Def.'s 56.1 ¶ 4.) Two of the straight trucks are Fords, which are smaller and offer a more comfortable ride. (Def.'s 56.1 ¶ 4.)

Ready-mix concrete is used in the construction of sidewalks, streets, building foundations and walls. (Def.'s 56.1 ¶ 3.) The ready-mix concrete industry is highly seasonal, being particularly busy during warm weather months and slowing substantially during cold weather months. (Def.'s 56.1 ¶ 5.) The fall season, when contractors often race to complete jobs before winter, is one of the busiest times for the ready-mix business. (Def.'s 56.1 ¶ 5.) Prairie must frequently operate on Saturdays, especially during the fall season. (Def.'s 56.1 ¶ 5.)

Prairie uses a special scheduling procedure for Saturdays, known as the Saturday Scheduling Policy. (Def.'s 56.1 ¶ 10.) The Saturday Scheduling Policy is administered in accordance with the

labor agreement between Prairie and the Union. (Def.'s 56.1 ¶ 17.) The labor agreement establishes Prairie's right to schedule mandatory Saturday overtime. (Def.'s 56.1 ¶ 16.) Hanson was aware of the Saturday Scheduling Policy. (Def.'s 56.1 ¶ 11.)

Under the Saturday Scheduling Policy, Prairie first attempts to fill any demand for drivers with volunteers. (Def.'s 56.1 ¶ 12.) Volunteers for Saturday overtime are scheduled according to seniority. (Def.'s 56.1 ¶ 12.) If the number of volunteers is less than the demand for trucks, Prairie requires drivers to work on Saturdays in reverse seniority order. (Def.'s 56.1 ¶ 13.) Drivers who do not wish to work on a Saturday must contact Order Board Managers Bob Kohl or Dave Borglin by 5:00 p.m. on Wednesday to ensure that they will get the day off. (Def.'s 56.1 ¶ 14.) The names of drivers scheduled to work on Saturday are read onto an automated audiotape that drivers can access by telephone. (Def.'s 56.1 ¶ 15.) The tape is generally completed before 7:00 p.m. on Friday. (Def.'s 56.1 ¶ 15.) All drivers are required to call the tape after 7:00 p.m. on Fridays to determine whether they are scheduled to work on Saturday. (Def.'s 56.1 ¶ 15.)

If a driver is listed to work on Saturday but fails to show up for work and fails to call in with an acceptable explanation, he is deemed to have refused an assigned job. (Def.'s 56.1 ¶ 18.) The Employee Handbook contains Prairie's rules of personal conduct. (Def.'s 56.1 ¶ 18.) Rule No. 1 provides that "refusal to do a job assigned" is punishable by discharge on the first offense. (Def.'s 56.1 ¶ 18).

Drivers who are not listed on the tape must still be available by telephone on Saturday morning until 9:00 a.m. in case Prairie is short of drivers. (Def.'s 56.1 ¶ 19.) If there are not enough scheduled drivers for the number of trucks needed on Saturday, Prairie calls the idle drivers in reverse seniority order and instructs them to report for work. (Def.'s 56.1 ¶ 19.) Idle drivers who

-8-

receive a Saturday morning call and are unavailable for work receive a written warning for "failure to do job as directed" under Rule No. 3 of the rules of personal conduct. (Def.'s 56.1 ¶ 20.)

On September 23, 1999, Prairie distributed a memorandum informing drivers that due to the high volume of work, the odds of being required to work on a Saturday were greatly increased. (Def.'s 56.1 ¶ 21.) On Friday, October 29, 1999, Prairie anticipated that Saturday, October 30th, would be one of its busiest Saturdays of 1999. (Def.'s 56.1 ¶ 22.) The number of trucks needed for that Saturday exceeded the number of volunteers. (Def.'s 56.1 ¶ 22.) Prairie assigned drivers for Saturday work, including Hanson, and listed their names on the Friday tape. (Def.'s 56.1 ¶ 23.)

Hanson did not recall asking not to be scheduled for work on October 30th, nor did any Prairie manager excuse him from working that Saturday. (Def.'s 56.1 ¶ 24.) Hanson did not call the tape Friday to determine whether he was scheduled to work on October 30th. (Def.'s 56.1 ¶ 25.) Hanson did not show up for work on Saturday and did not call to explain his absence. (Def.'s 56.1 ¶ 27.) By the time Hanson's absence was apparent, 9:00 a.m., it was too late for Prairie to secure another driver for Hanson's scheduled departure time; and the completion of several deliveries was delayed. (Def.'s 56.1 ¶ 29.) Hanson was physically able to work on October 30th, and his absence that day was unrelated to his alleged disabilities. (Def.'s 56.1 ¶ 28.) Hanson was in Wisconsin closing his camper on October 30th. (Def.'s 56.1 ¶ 27.)

Discipline notices are enclosed in a sealed envelope. (Def.'s 56.1 ¶ 39.) Stapled to the envelope is a service sheet that employees are required to sign acknowledging receipt of the discipline notice. (Def.'s 56.1 ¶ 39.) Signing the letter merely acknowledges delivery of the discipline notice not the merits of the discipline. (Def.'s 56.1 ¶ 39.) In the past, Hanson signed for several discipline notices without incident. (Def.'s 56.1 ¶ 40.)

Safety Manager Tony Scott was responsible for issuing discipline notices to drivers who did not report to work on October 30th. (Def.'s 56.1 ¶ 37.) Scott issued Hanson a written warning for "failure to do job as assigned" under Rule No. 3 because he was unaware that Hanson had been scheduled on the tape. (Def.'s 56.1 ¶ 38.) Tim Maguarny is a manager and had supervisory authority over Hanson. (Def.'s 56.1 ¶ 42.) On November 2, 1999, Maguarny attempted to deliver the written warning to Hanson. (Def.'s 56.1 ¶ 39.) Maguarny instructed Hanson to sign for the discipline notice and Hanson refused. (Def.'s 56.1 ¶ 41.)

Scott issued Hanson a final warning notice for "refusal to do job assigned". (Def.'s 56.1 ¶ 43.) The "job assigned" was Maguarny's instruction to sign for the discipline notice. (Def.'s 56.1 ¶ 43.) "Refusal to do job assigned" is a dischargeable offense, but Scott decided not to terminate Hanson for this refusal. (Def.'s 56.1 ¶ 43.) On November 2, 1999, Maguarny tried to deliver this notice to Hanson. (Def.'s 56.1 ¶ 44.) Plaintiff again refused to sign the service form attached to the discipline notice. (Def.'s 56.1 ¶ 44.) After this second refusal, Scott brought the matter to Human Resources Director Michael Borjas' attention. (Def.'s 56.1 ¶ 45.) Borjas informed Scott that Hanson had been scheduled on the Friday tape to work on Saturday and that his conduct should have been classified as "a refusal to do job assigned" under Rule No. 1, resulting in discharge, not a written warning. (Def.'s 56.1 ¶ 45.) Until this discussion, Scott did not know that Hanson had been listed on the Friday tape. (Def.'s 56.1 ¶ 45.)

Based on Hanson's failure to report, Borjas decided that he should be discharged. (Def.'s 56.1 ¶ 46.) Borjas, unlike Scott, also considered Hanson's refusals to sign the service forms for the discipline notices to be gross insubordination, a dischargeable offense under Rule No. 35 of the rules of personal conduct. (Def.'s 56.1 ¶¶ 46, 47.) On November 4, 1999, Borjas fired Hanson for gross

insubordination under Rule No. 35 and for refusal to do job assigned under Rule No. 1. (Def.'s 56.1 ¶ 48.)

One other driver had been scheduled on the Friday tape and did not show up for work on Saturday October 30th. (Def.'s 56.1 ¶ 31.) This driver called the Order Board on Friday night and Saturday morning to inform Prairie that he would be unavailable because he had to take his son to the doctor. (Def.'s 56.1 ¶ 31.) Because of his early start time, Prairie was able to find another driver. (Def.'s 56.1 ¶ 31.) This driver was issued a written warning for "failure to do job as directed or assigned" under Rule No.3 rather than a termination notice. (Def.'s 56.1 ¶ 32.) He signed for the discipline notice without incident. (Def.'s 56.1 ¶ 32.)

In December 1999, Hanson began working for Black Horse Trailers, where he works twelve-hour days five to six days a week. (Def.'s 56.1 ¶ 62.) Hanson drives for about fifty percent of his working hours at Black Horse Trailers. (Def.'s 56.1 ¶ 62.) Hanson is currently under no medical or work restrictions because of his back. (Def.'s 56.1 ¶ 60.)

## DISCUSSION

Defendant Prairie moves for summary judgment on Plaintiff Hanson's claim that Prairie violated the ADA by discharging him because of his disabilities. Prairie argues that summary judgment is proper because: (1) Hanson cannot demonstrate that he is "a qualified individual with a disability"; and (2) even if Hanson can show that he is disabled under the ADA, he was not discharged because of his disabilities.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures,

-11-

the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2001).

Plaintiff has offered no direct evidence of disability discrimination. To prove an ADA discrimination claim indirectly, Plaintiff is required to show: (1) he is disabled within the meaning of the ADA; (2) his work performance met the employer's legitimate expectations; (3) he was discharged; and (4) circumstances surrounding his discharge indicated that it was more likely than not that his disability was the reason for the adverse action. *Leffel v. Valley Financial Services*, 113 F.3d 787, 793 (7th Cir. 1997). Plaintiff's ADA claim fails because he has failed to show the first and fourth elements.

A "disability" under the ADA is "a physical or mental impairment that substantially limits one or more major life activities . . . or being regarded as having such an impairment." 42 U.S.C. § 12102(2). "Substantially limits" means "unable to perform a major life activity that the average person in the general population can perform" or "significantly restricted as to the condition, manner, or duration under which an individual can perform a . . . major life activity as compared to" the average person in the general population. 29 C.F.R. § 1630.2(j)(1). "Intermittent, episodic impairments are not disabilities[.]" *Van Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995).

Major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i). In determining whether an impairment is substantially limiting, the following factors will be considered: "(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or expected permanent or long term

impact of, or resulting from, the impairment." *Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir. 1995).

Hanson has not shown that he is a qualified individual with a disability under the ADA. Neither his alleged herniated disk nor his hyperactive lung disease substantially limit a major life activity. Hanson claims that, due to his alleged back injury, he walks at a slower pace, experiences discomfort in his back if he walks long distances, and occasionally needs his son to guide him from behind as he walks upstairs. Hanson does not use a walker or any other device. A diminished rate and pace of walking is not a significant restriction on the manner of walking. *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 951 (7th Cir. 2000); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999) (holding walking with a limp and at a significantly slower pace than the average person not substantially limiting). Hanson's inability to walk long distances without back discomfort is also not a significant restriction on the duration of his walking. *Banks v. Hit or Miss, Inc.*, 996 F. Supp. 802, 807 (N.D. Ill. 1998). Therefore, Hanson cannot show that his alleged herniated disk substantially limits the major life activity of walking.

Hanson's claims that his alleged back injury substantially limits his ability to roughhouse with his children or play sports also do not establish that his alleged back injury substantially limits a major life activity. Sports, roughhousing and other similar activities are not major life activities. *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998) (holding golfing and skiing and "engaging in physical exercise" are not major life activities); *Rosa v. Brinks, Inc.*, 103 F. Supp. 2d 287, 290 (S.D.N.Y. 2000) ("[S]ports activities are not major life activities."); *see also Moore*, 221 F.3d at 951 (noting that argument by plaintiff that bowling or camping were major life activities would not be meritorious).

Hanson's claims that he must shift when sitting for long periods of time and use a tens unit

to alleviate back pain also do not establish that his alleged back injury substantially limits a major life activity. In *Colwell*, the Second Circuit held that even if sitting were a major life activity, the plaintiff's testimony that he could not sit "for too long . . . without getting up and stretching" and a limitation by his doctor that plaintiff be allowed to change position when sitting did not "support the conclusion that [plaintiff was] 'substantially' impaired in his ability to . . . sit[.]" 158 F.3d at 643. Similarly, Hanson's testimony that he must shift in his seat when sitting for long periods of time is insufficient to establish that his alleged herniated disk substantially impairs a major life activity. Hanson's current work driving a truck for Black Horse Trailers for up to twelve hours per day suggests that his ability to sit for long periods of time has not been substantially limited. He is also under no work restrictions because of his back at his current job.

Furthermore, the use of the tens unit to alleviate Hanson's back pain while driving further demonstrates that the alleged back injury is not substantially limiting. In *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482-83 (1999), the Court held that "[a] a person whose physical . . . impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." The tens unit is a corrective measure because it effectively alleviates Hanson's back pain. Thus, Hanson's alleged back injury is not substantially limiting under *Sutton*.

Hanson's alleged lung condition also does not substantially limit a major life activity. Hanson claims that, due to his alleged lung condition, he experiences shortness of breath during stressful situations at home. Hanson has never received medical treatment for his lungs since 1989. He has also never experienced shortness of breath while working at Black Horse Trailers. In fact, his lungs and ability to breathe were never affected by traveling near Yards 8 or 9 while he worked

for Prairie. Hanson's shortness of breath seems to be the type of "intermittent, episodic impairment" that is not covered by the ADA. *Van Zande*, 44 F.3d at 543.

Furthermore Hanson's claim that he must discontinue sexual relations with his wife twenty-five to thirty-five percent of the time because of his breathing does not establish that his alleged lung condition substantially limits a major life activity. *See Contreras v. Suncast Corp.*, 237 F.3d 756, 764 (7th Cir. 2001) (holding that "a change in the frequency with which an individual can engage in intercourse" does not constitute a substantial limitation to a major life activity). The Seventh Circuit also reasoned that even if "engaging in sexual relations is a major life activity . . . a bald declaration [by the plaintiff], without anything more, cannot create a genuine issue of material fact as to [plaintiff's] being disabled that would preclude summary judgment." Furthermore, in cases finding that an impairment substantially limits engaging in sexual relations, the impairment is more permanent than Hanson's and is supported by medical evidence. *See, e.g., McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999) (holding impotence caused by plaintiff's mental impairment substantially limiting); *Buskirk v. Apollo Metals*, 116 F. Supp. 2d 591, 598 (E.D. Pa. 2000) (holding plaintiff's testimony and wife's affidavit regarding sexual function insufficient to create genuine issue of material fact); *Hillyer v. Runyon*, 95 F. Supp. 2d 1016, 1021 (S.D. Iowa 2000) (holding testicular cancer-related condition substantially limited ability to engage in sexual relations and reproduce); *Saunders v. Webber Oil Co.*, No. 99-246-B-H, 2000 WL 1781835, at *7 (D. Me. Nov. 17, 2000) (holding impotence that had lasted five days at time of plaintiff's termination did not constitute a substantial limitation). Therefore, Hanson's sole testimony that he must discontinue relations, at most, thirty-five percent of the time does not establish that his lung condition substantially limits a major life activity. Hanson has not been able to show that he had an

actual disability under the ADA.

Hanson also cannot show that Prairie perceived him as a person with an impairment that substantially limited a major life activity. 42 U.S.C. § 12102(2). While Hanson has demonstrated that Prairie knew about his alleged medical conditions, he has not shown that Prairie believed that he was substantially limited by them. *See Moore*, 221 F.3d at 954. During his deposition, Hanson testified that he had no reason to believe that Borjas or Scott are prejudiced against people with disabilities or that Prairie supervisors perceived him as being limited in his ability to walk or perform manual tasks. Borjas testified in his deposition that he did not perceive Hanson as having a significant back injury or any other medical condition. Thus, there is no factual dispute as to whether Prairie perceived Hanson as disabled.

Since neither his alleged lung nor back conditions are substantial limitations on any major life activity and Prairie did not perceive him as having an impairment that substantially limited a major life activity, Hanson is not disabled within the meaning of the ADA.

Finally, Hanson has not shown that it was more likely than not that his disability was the reason for his termination. *Leffel*, 113 F.3d at 793. A plaintiff can demonstrate this by showing that "persons not disabled or perceived to be disabled were treated differently than plaintiff". *Leffel*, 113 F.3d at 793. After the plaintiff has established a *prima facie* case of discrimination, the "defendant must articulate a legitimate non-discriminatory reason for discharging [him]. . . . [T]he plaintiff must then establish that this proffered reason is really a pretext for discrimination." *Leffel*, 113 F.3d at 792.

However, even if Hanson were able to establish that he was treated differently than non-disabled employees, he cannot establish that the reasons for his discharge were pretextual. "A

-16-

plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence." *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998). An honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless. *Debs*, 153 F.3d at 396.

Prairie presents two reasons for Hanson's discharge: (1) Hanson's absence from work on Saturday, October 30, 1999, after being scheduled on the Friday tape was "a refusal to do job assigned" under Rule No. 1 of the rules of personal conduct, a dischargeable offense; and (2) Hanson's repeated refusals to sign the service forms for the discipline notices was gross insubordination, a dischargeable offense under Rule No. 35 of the rules of personal conduct.

Hanson argues that several inconsistencies show that Prairie's reasons for his termination are pretexts for discrimination. He points out that he was terminated after initially receiving a discipline notice that explicitly waived termination. The reason for Hanson's initial warning is that Scott made a mistake on November 1, 1999, when he issued Hanson a written warning for "failure to do job as assigned". At the time Scott issued the initial warning, he was unaware that Hanson was scheduled on the Friday tape. Scott assumed that dispatchers tried to call Hanson on Saturday morning and that he was unavailable. When Scott brought the matter to the attention of the Director of Human Resources, Michael Borjas informed Scott that Hanson had been scheduled on the tape and that he should have been discharged for refusing to do an assigned job under Rule No. 1 of the rules of personal conduct. Hanson has not presented any facts that refute Prairie's argument that Scott was mistaken.

Hanson also argues that it is strange that Scott waived termination but that Borjas did not.

-17-

Borjas decided to terminate Hanson because of his failure to show up for work on October 30, 1999, and because Borjas believed that Hanson's refusals to sign for discipline notices constituted gross insubordination under Rule No. 35 of the rules of personal conduct. Rule No. 35 provides that "major insubordination" is a dischargeable offense. While Scott did not believe Hanson's behavior to be gross or major insubordination, he did think that Hanson's behavior constituted "refusal to do job assigned", which is also a dischargeable offense. As was noted earlier, Scott mistakenly believed that Hanson was an unavailable idle driver not subject to discharge.

Hanson further argues that his termination was pre-textual because no specific rule or policy states that a refusal to accept a warning is grounds for another warning. While no specific rule or policy so provides, Hanson has not presented any facts that show that it was not Prairie's practice to issue a warning when a previous warning has been refused. Nor has Hanson presented any facts that show that repeated refusals to accept discipline notices are not treated as major insubordination by Prairie supervisors. Therefore, this argument also fails.

Hanson further argues that other similarly situated drivers were treated more favorably. Hanson points out that he was the only driver who was terminated for not showing up for work on October 30, 1999. However, the facts show that Hanson was the only employee disciplined who was scheduled on the Friday tape who failed to show up for work without a prior explanation. The only other employee who was scheduled on the Friday tape called on Friday night and Saturday morning with an acceptable reason for not showing up for work that Saturday and therefore was excused. Hanson did not attempt to call the Order Board on Friday or Saturday; and even if he had, his excuse, closing his camper, would have been unacceptable.

Finally, in his brief, Hanson attempts to tie his termination to his complaints about

assignment to Yard 9, where he allegedly has problems with his eyes. Hanson argues that Prairie's frustration with his alleged disabilities culminated in his termination on November 4, 1999. However, this argument lacks support. Prairie has given Hanson two accommodations in the past: (1) it assigned him to a Ford model straight truck when he complained that driving front-wheel-drive trucks irritated his back, and (2) Prairie dispatchers made efforts not to send Hanson to Yards 8 or 9 unless it was absolutely necessary. Furthermore, Hanson testified that he had no reason to believe that Scott or Borjas were prejudiced against people with disabilities. Moreover, Hanson's absence on October 30, 1999, had nothing to do with his alleged disabilities. These facts undermine Hanson's assertions that Prairie was frustrated with his alleged disabilities.

Thus, Hanson has offered no evidence from which a rational jury could conclude that Prairie did not honestly believe its proffered reason for terminating his employment. Prairie's termination of Hanson represented an earnest business decision based on Hanson's refusal to do an assigned job and his gross insubordination. Courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 920 (7th Cir. 1996).

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

John W. Darrah, Judge
United States District Court

Date: September 19, 2001